UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA


COURTNEY HOLMES,                )
                               )
              Plaintiff,        )
                               )          No. 1:12-cv-324
v.                              )
                               )          *Mattice / Lee*
COMMISSIONER OF SOCIAL SECURITY, )
                               )
              Defendant.        )


## REPORT AND RECOMMENDATION

Plaintiff Courtney Holmes brought this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying him Supplemental Security Income ("SSI"). Plaintiff and Defendant have both moved for summary judgment [Docs. 6, 8]. Plaintiff alleges the Administrative Law Judge ("ALJ") misinterpreted Plaintiff's treating physician's February 2011 opinion and did not comply with the treating physician rule or Social Security Ruling 83-10 in considering this opinion. For the reasons stated below, I **RECOMMEND** that (1) Plaintiff's motion for summary judgment [Doc. 6] be **DENIED**; (2) the Commissioner's motion for summary judgment [Doc. 8] be **GRANTED**; and (3) the decision of the Commissioner be **AFFIRMED**.

## I.    ADMINISTRATIVE PROCEEDINGS

Plaintiff initially filed his application for SSI on April 14, 2010, alleging disability as of March 20, 2010 (Transcript ("Tr.") 21, 106-12). Plaintiff's claim was denied initially and upon reconsideration and he requested a hearing before the ALJ (Tr. 52-57, 61-67). The ALJ held a

hearing on March 29, 2011 during which Plaintiff was represented by an attorney (Tr. 34-49). The ALJ issued his decision on April 13, 2011, and determined Plaintiff was not disabled because there were jobs that existed in substantial numbers in the national economy that Plaintiff could perform (Tr. 18-30). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final, appealable decision of the Commissioner (Tr. 1-6, 15). Plaintiff filed the instant action on October 5, 2012 [Doc. 1].

## II.    FACTUAL BACKGROUND

### A.    Education and Background

Plaintiff was 23 years old, a younger individual, at the disability onset date and was 24 years old at the time of the hearing and the ALJ's decision (Tr. 29-30). Plaintiff completed the tenth grade in school, and was currently working to complete his GED (Tr. 122, 237). Plaintiff had previously worked as an inventory worker, a donut packer, a fast food worker, a waiter, and a server in a cafeteria, but he had not worked since 2007 for reasons not fully explained, but unrelated to physical disability (Tr. 37, 122). Plaintiff testified he was disabled because he injured his left arm on March 20 (2010) and his bone popped out; it later got infected, and he was in the hospital for about a month (Tr. 37-38). Plaintiff stated that after 14 surgeries, two plates and 16 screws in his arm, it was still not all well (Tr. 38). Plaintiff was right-handed and testified he was still able to use his left arm to lift light objects, squeeze and make a grip, and used it as a guide for heavier items held in his right arm (Tr. 38). Plaintiff could probably pick up a gallon of milk with his left arm, but would not be able to hold it for more than two minutes before he experienced pain (Tr. 38-39, 41). The fingers on Plaintiff's left hand worked somewhat well and Plaintiff could manage buttons and tie his shoes, but he could not, for example, open a jar of pickles or comb his hair using his left hand (Tr. 39). Plaintiff's ring and pinky fingers were

weaker and harder to use than others and he could rarely use them to grip items (Tr. 42, 44-45). Plaintiff could reach overhead, to get a plate from a cabinet, but he could not fully extend his elbow and had a limited range of motion (Tr. 40). Plaintiff testified that he could not use his left arm even to lift light items for any long period of time without experiencing pain (Tr. 41). Plaintiff also testified to numbness in the area on his arm where he had skin grafts and some numbness in his fingers to the extent he could not distinguish between hot or cold water with that hand (Tr. 42-43). As of the hearing, a year after his accident, Plaintiff was no longer taking pain medication and had not been for about five months; he was also not taking any over-the-counter medication for pain (Tr. 40, 47). Plaintiff stated he had gotten better since the accident and his doctors thought he might need another surgery, but he did not want any more surgeries (Tr. 46-47).

### B. Vocational Expert Testimony

During the hearing, the ALJ sought testimony from vocational expert ("VE") Dr. Rodney Caldwell (Tr. 47). The ALJ first asked the VE if an essentially one-armed person could perform any kind of medium work, and the VE testified they could not do so safely (Tr. 47). The ALJ next asked the VE to assume a hypothetical individual who was limited to light work, without problems with the dominant upper extremity, but with the non-dominant upper extremity used as a guide only on very light objects weighing a pound or two and with a very small amount of pinch ability with the fingers and the thumb; the ALJ further specified the individual could not make a full grip, and this upper extremity was close to completely useless and was meant to be only a "helper arm" on very light objects (Tr. 47-48). The VE testified this individual could not perform any of Plaintiff's past work, but could work as a production inspector, with 1,000 jobs within 200 miles of Chattanooga and 100,000 nationally; a cashier II, with 800 positions in the

region and 85,000 nationally; and a machine tender operator, with 1,200 jobs regionally and 130,000 nationally (Tr. 47-48). The VE clarified that a machine tender would be tending an automatic machine, but would not be putting anything in or taking anything out of the machine and instead would simply shut the machine down if something went wrong (Tr. 48).

### C. Medical Records

Plaintiff was seen at Memorial Hospital for various complaints in 2006 and 2007, including a visit for a bruised hand, a brief visit where he complained of rib pain after a wrestling injury but did not stay for treatment, and another visit for chest pain several months later (Tr. 354-77). During his visit for the bruised hand, x-rays of Plaintiff's right hand showed a previous fracture of the radius and ulna (Tr. 372). On March 20, 2010, Plaintiff reported to Erlanger Hospital emergency room after being injured in a wrestling accident when he was picked up and slammed down and landed on his left arm (Tr. 237). X-rays revealed Plaintiff had a grade II open fracture to his radius and ulna and the ulna had pierced the skin (Tr. 191-96, 237-38, 306). He was admitted to the hospital where he underwent an irrigation and debridement of the open fracture and open reduction and internal fixation of both bones by Dr. Mark Freeman (Tr. 200-02, 239-41). On March 22, 2010, Plaintiff underwent two additional operations; the first was an operation by Dr. Daniel Fisher due to questionable thrombosis of the left brachial artery, and this procedure included an open brachial artery embolectomy, a left ulnar embolectomy, and a left radial embolectomy (Tr. 242-43). The second was a fasciotomy of the extensor and flexor compartments for compartment syndrome of the left forearm (Tr. 244-49). On March 23, 2010, three days after the injury, Plaintiff underwent a fourth surgery because of an unusual, pervasive myonecrosis of the dorsal and volar compartments with interfascial infection; he was also placed on various antibiotics (Tr. 250-57, 281-88, 292). Dr. Freeman performed an extensive irrigation

and debridement of the volar and dorsal forearm and repeated the Vac-Pac placement, while Dr. Fisher injected the radial and ulnar arteries with papaverine to encourage blood flow (Tr. 250-57). From March 24, 2010 until Plaintiff was discharged on April 16, 2010, he underwent several additional operations to address his infection and to provide wound therapy, including skin grafting (Tr. 258-80, 289). Plaintiff returned for follow up visits on wound care in April and May 2010 (Tr. 209-17). Plaintiff would follow with Dr. Freeman and the hand clinic and would begin physical therapy (Tr. 290-91).

The day after Plaintiff's discharge from Erlanger, on April 17, 2010, Plaintiff reported to Memorial Hospital complaining of a fast heart rate after taking a friend's Lortab (Tr. 345-52). Plaintiff returned on April 22 after taking an extra dose of antibiotics that was causing itchiness and shortness of breath; he also complained of left arm pain (Tr. 336-44). Plaintiff returned to Memorial on April 27, 2010 complaining of eye irritation, and he also complained of left arm pain (Tr. 327-34). The next day, Plaintiff followed up with the Erlanger hand clinic and complained of significant pain in his left upper extremity (Tr. 312-13, 393-94). Dr. Kevin Day noted the wounds were healing well and that the skin graft was well-received, but Plaintiff had an extremely limited range of motion to his elbow, wrist, and hand (Tr. 312). Plaintiff was unable to actively extend his fingers while his wrist was extended, and Dr. Day recommended aggressive physical therapy to prevent stiffening of the joints and to ensure that Plaintiff regained significant function of his left arm (Tr. 312-13). This same day, Plaintiff was seen by Dr. Brandon Asbury at University Orthopaedic Associates; on examination, Dr. Asbury noted Plaintiff's elbow range of motion, pronation and supination were severely limited, and the fingers and wrist were stiff on passive range of motion (Tr. 388). The fracture was healing, and Dr. Asbury noted Plaintiff may eventually benefit from a tendon transfer (Tr. 388).

Case 1:12-cv-00324-HSM-SKL   Document 10   Filed 08/27/13   Page 5 of 21   PageID #: 36

Plaintiff, with the help of his girlfriend, filled out a function report on May 11, 2010 (Tr. 139-46). Plaintiff indicated that a typical day involved waking up, brushing his teeth and taking a shower, eating breakfast, laying around and watching TV, doing arm exercises and taking medication, and occasionally going out to visit family and friends (Tr. 140). Plaintiff's arm injury caused problems with daily activities to the extent that he can no longer do his hair, cook or wash dishes, tie his shoe, wash his right arm, take care of his child, or fix things around the house (Tr. 140). Plaintiff indicated he had problems with personal care activities and could not sleep well due to pain; he could not cook, do any chores, drive, or go out alone due to his medication, arm split, and pain (Tr. 140-42). Plaintiff stated he could not lift anything at all, could not complete any tasks, and could not concentrate because of throbbing pain; however, Plaintiff could pay attention for long periods of time and could follow instructions extremely well (Tr. 144). Plaintiff estimated he could walk about 15 minutes before stopping and resting for five minutes (Tr. 144).

Plaintiff reported to the hand clinic for follow up on May 12, 2010 (Tr. 391-92). Plaintiff reported he had been going to physical therapy but still had significant pain and could not afford the down payment for the pain clinic (Tr. 391). On examination, Plaintiff's wound was still healing well and his range of motion in his elbow and wrist was still limited, although it was better in his fingers (Tr. 391). Plaintiff was prescribed Lortab and was to continue aggressive physical therapy (Tr. 392). Plaintiff also saw Dr. Freeman for a follow up on May 12 and Dr. Freeman observed Plaintiff's wound was healing well, but he had decreased range of motion and stiffness; he encouraged Plaintiff to work on range of motion exercises and try to rehabilitate the hand for activities, as Plaintiff seemed to be protecting the hand and Dr. Freeman thought it was detrimental to his recovery (Tr. 387). Plaintiff returned to the hand clinic on June 9, 2010 and

complained of continued pain; he was going to physical therapy only two days a week because he did not have transportation to go more frequently (Tr. 389-90). Plaintiff's skin graft had fully healed and he was somewhat improved on examination (Tr. 389-90). Dr. Day told Plaintiff that he may benefit from scar release or tendon transfer in the future, but it would depend on further joint range of motion and functionality improvement (Tr. 390).

On June 20, 2010, Dr. Christopher Fletcher filled out a physical residual functional capacity ("PRFC") assessment form (Tr. 314-22). Dr. Fletcher opined Plaintiff could occasionally lift and/or carry 20 pounds, frequently lift and/or carry up to 10 pounds, could stand, walk, or sit for a total of six hours in an eight hour day, and was limited in his ability to push and/or pull because he could never use his left upper extremity (Tr. 315). Dr. Fletcher opined Plaintiff should never climb a ladder, rope or scaffolds and should never crawl, but was otherwise unlimited in other postural activities; however, his ability to reach, handle, finger or feel was limited because he could never use his left upper extremity (Tr. 316-17). Dr. Fletcher noted Plaintiff's allegations were entirely credible due to the complications from his injury and it appeared likely he would need additional surgeries to regain significant function of the arm (Tr. 321). Dr. Fletcher's assessment was affirmed on August 17, 2010 (Tr. 323).

Plaintiff returned to University Orthopaedic Associates on June 23, 2010 and reported doing better and having improved range of motion in his elbow, but the range of motion in his hand remained about the same (Tr. 386). Plaintiff's fracture looked like it had consolidated, but the views of Plaintiff's arm showed significant resorption of bones beyond that expected (Tr. 386). Dr. Freeman filled out a medical opinion form on August 11, 2010 and stated Plaintiff had still not achieved solid union of the radius or ulna, but that was expected to occur in three to four months (Tr. 325). Dr. Freeman indicated more surgery was possible due to complications with

the injury and rehabilitation would be required for the rest of Plaintiff's life (Tr. 325). Dr. Freeman stated Plaintiff was unlikely to gain near normal function of his upper left extremity and was doubtful that he would even gain functional use (Tr. 325). Dr. Freeman further opined that Plaintiff absolutely should meet requirements for SSI (Tr. 325).

Plaintiff had a follow up visit with University Orthopaedic Associates on August 25, 2010 and again reported improvement in his elbow from physical therapy, but not in his other joints (Tr. 385). On examination, Plaintiff had very weak strength in his hand and wrist and was unable to make a fist (Tr. 385). After discussing Plaintiff with Dr. Freeman, Dr. Rhodes noted Plaintiff would continue with physical therapy and stretching, and may have options for tendon transfer to help with functioning (Tr. 385). On September 16, 2010, Plaintiff returned for a follow up visit and reported he was wrestling with his brother on September 2 and sustained a left elbow and left humeral head fracture; he went to the emergency room and was given a split, and his left forearm was in a cast (Tr. 384). Plaintiff reported his range of motion was improved in his left arm before he sustained the fracture, and he was angry that he needed to leave the cast on (Tr. 384). X-rays obtained from the emergency room showed a proximal left humeral head fracture and a fracture of the medial epicondyle of the humerus (Tr. 384). Dr. Adcock instructed Plaintiff to rest his arm, refrain from wrestling and horseplay and to follow up with Dr. Freeman in one week (Tr. 384). Plaintiff returned to see Dr. Freeman on September 22, 2010 and Dr. Freeman removed the arm split, noted tenderness, and observed Plaintiff had good range of motion in his shoulder, but he still had extremely limited range of motion and function in his forearm, and his elbow range of motion had gotten worse since the new injury (Tr. 382-83). Dr. Freeman noted the new elbow fracture put him at extremely high risk of causing more problems and stiffness with his arm, and Plaintiff was instructed to avoid altercations, bring his copayment

to the clinic when he returned to follow up appointments or he would not be seen, and to engage in range of motion exercise immediately (Tr. 382-83).

On February 23, 2011, Dr. Freeman saw Plaintiff for a follow up visit and noted Plaintiff was doing much better, was happy and smiling, and did not ask for pain medication (Tr. 380). Plaintiff reported the numbness and tingling were mostly gone from his hand, but that there was some numbness near his skin graft (Tr. 380). Dr. Freeman noted the range of motion in his elbow and shoulder had improved, but that it had decreased in his wrist, and Plaintiff was able to make half of a fist, but had difficulty with grip strength (Tr. 380). He was able to oppose his thumb and pinky fingers and his fine motor control had improved, although he lacked extensor function of his thumb (Tr. 380). Finally, Dr. Freeman noted:

> 1. I support his application for disability due to his age and inability to significantly do fine motor control of the left arm or carry weight more than five pounds.
> 2. I discussed with the patient that he is capable of employment, if he were to be employable for a job with no use of his left upper extremity. Use of his left upper extremity might help him regain some function; however, I suspect that employers are not going to hire him due to concerns for job safety, workers compensation issues, and medical care for his left arm. Therefore, I suspect it is medically reasonable that he will not be gainfully employable.
>
> I understand the patient has some social issues with child support and other issues. I discussed this with him today. I think he has been compliant over the last 3-5 months and will support him with use of his left upper extremity and gainful employment as much as I can.

(Tr. 380). Plaintiff did not need to continue following up with Dr. Freeman, but he could return if he had problems or if his condition changed (Tr. 381).

### III.    ALJ's FINDINGS

#### A.    Eligibility for Disability Benefits

The Social Security Administration determines eligibility for disability benefits by following a five-step process.  20 C.F.R. § 404.1520(a)(4)(i-v).  This process provides:

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment-i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities-the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009).  The claimant bears the burden to show the extent of his impairments, but at step five, the Commissioner bears the burden to show that, notwithstanding those impairments, there are jobs the claimant is capable of performing.  *See Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

#### B.    ALJ's Application of the Sequential Evaluation Process

At step one, the ALJ found Plaintiff had not engaged in substantial gainful activity since April 14, 2010, the application date (Tr. 23).  At step two, the ALJ found that the Plaintiff had the following severe impairments: status post catastrophic left both-bone forearm fracture and status post multiple left forearm surgeries due to compartment syndrome and necrotizing fasciitis or myonecrosis (Tr. 23).  At step three, the ALJ found Plaintiff did not have any impairment or

combination of impairments to meet or medically equal any of the presumptively disabling impairments listed at 20 C.F.R. Pt. 404, Subpt. P, App'x. 1 (Tr. 26). The ALJ found that the Plaintiff had the residual functional capacity ("RFC") to perform light work except that he could use the non-dominant left upper extremity as a guide only (Tr. 26). At step four, the ALJ concluded that the Plaintiff was unable to perform his past work (Tr. 29). At step five, the ALJ noted Plaintiff was a younger individual as of the date of the application, he had a limited education and he was able to communicate in English (Tr. 29). After considering Plaintiff's age, education, work experience, and RFC, the ALJ found there were jobs that existed in significant numbers in the national economy which Plaintiff could perform (Tr. 29). This finding led to the ALJ's determination that Plaintiff had not been under a disability since April 14, 2010, the date the application was filed (Tr. 30).

## IV.    ANALYSIS

Plaintiff asserts two arguments that challenge the ALJ's treatment of Dr. Freeman's February 2011 opinion. Essentially, Plaintiff finds fault with the ALJ's interpretation of the opinion and claims the ALJ failed to comply with the treating physician rule and Social Security Ruling 83-10 in considering Dr. Freeman's opinion.

### A.    Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters*, 127 F.3d at 528). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of

the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotations omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decision makers because it presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The court may not, however, consider any evidence which was not before the ALJ for purposes of substantial evidence review. *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Furthermore, the court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, No. 2:08-CV-189, 2009 WL 2579620, at *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, No. 1:08-CV-651, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived).

### B.    The ALJ's Treatment of Dr. Freeman's Opinion

Plaintiff argues the ALJ's decision is not supported by substantial evidence because he failed to properly interpret Dr. Freeman's February 2011 statement and incorrectly concluded Dr. Freeman stated Plaintiff was capable of employment [Doc. 7 at PageID# 16].  Plaintiff alleges the characterization of Dr. Freeman's opinion (as stating that Plaintiff is capable of employment) is only partially true because Dr. Freeman actually wrote that, in Plaintiff's words, he would be capable of employment "only if the employment did not require any use of the left arm" [*id.*]. Plaintiff argues a correct interpretation of this opinion requires the conclusion that Plaintiff cannot perform any work at all; and, given the ALJ's conclusion, Plaintiff claims it is unclear whether the ALJ ignored the opinion or just misinterpreted it [*id.*].  Plaintiff further argues that, in considering this opinion, the ALJ failed to comply with the treating physician rule, as the ALJ should have given controlling weight to the opinion and concluded Plaintiff could not use his left arm and was thus disabled and unemployable [*id.*].  Plaintiff also argues the ALJ failed to comply with Social Security Ruling 83-10, which dictates that light work requires the use of both arms and hands to grasp and handle objects [*id.* at PageID# 16-17].  Therefore, Plaintiff contends that a proper reading of Dr. Freeman's opinion, in conjunction with Rule 83-10, would require the conclusion that all light and sedentary work is precluded and Plaintiff is disabled [*id.* at PageID# 17].

The Commissioner asserts the ALJ did not misinterpret the statements by Dr. Freeman and contends it is apparent the ALJ incorporated Dr. Freeman's medical limitations into the RFC [Doc. 9 at PageID# 26].  The Commissioner argues the ALJ accounted for the limitation identified by Dr. Freeman by restricting Plaintiff to jobs where his non-dominant left upper extremity would be used as a guide only [*id.*].  The Commissioner notes that Dr. Freeman's

opinion also indicated he would support Plaintiff's attempts to obtain employment, and that Dr. Freeman's speculation that Plaintiff may be hindered in his ability to find employment due to other factors is not part of Dr. Freeman's medical opinion and is, therefore, not entitled to any weight [*id.*].  Instead, these statements as to Plaintiff's ability to find work due to safety, liability, and insurance issues do not speak to Plaintiff's actual medical ability to perform work [*id.* at PageID# 26-27].  Moreover, if Dr. Freeman had indeed opined, as Plaintiff suggests, that Plaintiff was incapable of employment, this statement would not be entitled to controlling weight because that is a determination reserved for the Commissioner [*id.* at PageID# 27].  The Commissioner argues the ALJ evaluated the evidence, properly interpreted Dr. Freeman's opinion, and did not run afoul of either the treating physician rule or Ruling 83-10; as to the latter, the Commissioner contends this ruling only applies to cases in which the ALJ is relying on the Medical-Vocational Rules ("the Grids") [*id.* at PageID# 28-29].  Here, the ALJ did not rely on the Grids because he determined Plaintiff could not perform a full range of any exertional level of work and had additional limitations; therefore, the ALJ relied upon the testimony of a VE to determine whether there were jobs Plaintiff could perform with the additional restriction on the use of his left arm [*id.* at PageID# 29].  The Commissioner asserts the VE's testimony indicated Plaintiff could perform jobs at the light work level, and the ALJ properly relied upon this testimony as substantial evidence Plaintiff could make an adjustment to other work [*id.*].

The ALJ's decision states, in relevant part, as follows:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.  The objective medical record establishes the claimant has a history of experiencing a catastrophic left both-bone forearm

fracture followed by multiple left forearm surgeries. However, following the claimant's treatment with the multiple surgeries, skin grafting, physical therapy, wound VAC, and multiple narcotic medications, the medical record does not show significant current abnormalities to account for his alleged disabling symptoms and the clinical signs do not reflect a current level of impairment that would preclude all work activity. For example, a treating physician noted the wounds were well-healed with excellent skin grafting. Also, another treating physician noted that the numbness and tingling in his left hand had mostly disappeared. Moreover, examinations have revealed that the claimant has the ability to raise his left arm above his head, although he cannot fully extend his left elbow; oppose the thumb to each finger on his left hand with poor strength in the fourth and fifth digits; and pick-up a gallon of milk with his left arm. Additionally, the claimant testified that he could lift a gallon of milk and hold it for a minute; reach overhead with his left arm; tie his shoes; and button his buttons. He further testified that he is not currently taking any pain medications. Furthermore, he has several scars on his arm with marked atrophy of the distal forearm, but has the ability to pick-up his baby with his dominant right arm and use the left arm as a helper or guide, as I incorporated into my residual functional assessment. Moreover, Dr. Freeman stated, in February 2011, that the claimant is capable of employment.
. . .
The record does not contain any opinions from treating physicians or providers, which indicate that the claimant is currently disabled or even has limitations greater than those determined in this decision.

Dr. Freeman opined in a medical statement completed in August 2010, which was five months following the accident, it is unlikely that the claimant will gain near normal function. He stated that, hopefully, the claimant will gain functional use, but probably he will not. Dr. Freeman further opined that the claimant absolutely should meet the requirements of supplemental security income. However, Dr. Freeman stated in February 2011, which was 11 months following the accident, that the claimant is capable of employment. I give Dr. Freeman's opinion in August 2010, little weight as it was given only five months following the accident, which was too soon and his arm had not had time to completely heal. Moreover, I give Dr. Freeman's statement, which was made in February 2011, significant weight, as it was given 11 months after the accident and after the arm had time to completely heal. **This is not to say that the claimant came close to the 12 month**

> **mark for being unable to work; he was able to work somewhere between 5 to 11 months after his accident.**

(Tr. 27-28) (emphasis in original). The ALJ also gave considerable weight to the PRFC completed by the state agency physician, who opined Plaintiff could perform light work, but could not use his left upper extremity (Tr. 28-29).

If a claimant can perform the full range of any given exertional level of work (e.g., sedentary, light, or medium work), the Commissioner may meet his burden of establishing no disability by relying on the Grids. *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981) (to use the Grids, the claimant's abilities must "precisely coincide" with the categories used by the Grids). But reliance on the Grids is improper when the claimant's ability to perform the full range of occupations at a particular exertional level is "significantly limit[ed]" by impairments not accounted for in the Grids. *Cole v. Sec'y of Health & Human Servs.*, 820 F.2d 768, 771 (6th Cir. 1987). If the claimant's occupational base is "eroded" in this manner, the Grids may be used only as a "framework" for decision, and the ALJ must find other evidence (for example, a VE's testimony) that a person with the claimant's limitations can perform other specific jobs in significant numbers. Social Security Ruling ("SSR") 96-9p, 1996 WL 374185; *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 424 (6th Cir. 2008).

Ruling 83-10 provides basic information about what the various exertional levels of work require in terms of sitting, standing, walking, handling, grasping, and fingering. As to light work, the Ruling states in pertinent part: "[m]any unskilled light jobs are performed primarily in one location, with the ability to stand being more critical than the ability to walk. They require the use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." SSR 83-10, 1983 WL 31251, at *6. It further states, however, "[t]he RFC addressed in a **rule** establishes the

presence of an occupational base that is limited to and includes a full range (all or substantially all) of the unskilled occupations existing at the exertional level in question." *Id.* at *3 (emphasis added). The "rule" referenced is one of the Medical-Vocational Rules, or Grids. As such, this Ruling is helpful if the Grids are applicable, as it provides a basic overview of the requirements of different exertional categories of jobs. It is not indicative, however, of the functional requirements of each light work job when additional restrictions are imposed on a claimant and he or she is unable to perform a full range of that category of work. Because Plaintiff has the additional restriction that he can use his upper left extremity as a guide only, reliance on the Grids would be improper. Plaintiff's occupational base is eroded, as evidenced by medical records, Plaintiff's testimony, and the RFC. Under these circumstances, the Grids are used as a framework only and the VE's testimony becomes essential to identify which of the jobs within an exertional category can be performed with the additional restrictions. In this case, the VE testified as to the existence of significant numbers of light jobs which a person with Plaintiff's limitations could perform. As such, I **FIND** the circumstances of this case are such that the ALJ did not err in failing to explicitly address all of the information contained in Ruling 83-10.

I further **FIND** the ALJ did not misinterpret or ignore Dr. Freeman's statement as suggested by Plaintiff. To the contrary, I **CONCLUDE** the ALJ properly complied with the law and regulations governing the weight to be given to a treating physician's opinion, often referred to as the treating physician rule. A treating physician's opinion is entitled to complete deference if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2) (now (c)(2)) (alteration in original). Even if the ALJ determines that the treating source's

opinion is not entitled to controlling weight, the opinion is still entitled to substantial deference or weight commensurate with "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source." *Simpson v. Comm'r of Soc. Sec.*, 344 F. App'x 181, 192 (6th Cir. 2009); 20 C.F.R. § 404.1527(c)(2); SSR 96-2p, 1996 WL 374188. The ALJ is not required to explain how he considered each of these factors, but must nonetheless give "good reasons" for rejecting or discounting a treating physician's opinion. *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight." *Wilson*, 378 F.3d at 545 (quoting SSR 96-2p). Failure to give good reasons requires remand, even if the ALJ's decision is otherwise supported by substantial evidence, unless the error is *de minimus*. *Id.* at 544, 547.

A treating physician cannot, however, opine that a claimant is disabled, as an opinion that an individual cannot work is not a medical opinion entitled to any weight and is instead an issue reserved to the Commissioner. "When a treating physician … submits an opinion on an issue reserved to the Commissioner—such as whether the claimant is 'disabled' or 'unable to work'—the opinion is not entitled to any particular weight." *Turner v. Comm'r of Soc. Sec.*, 381 F. App'x 488, 493 (6th Cir. 2010); *see also* 20 C.F.R. § 404.1527(d)(1)-(2) ("Opinions on some issues, such as the examples that follow, are not medical opinions … but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case …").

Dr. Freeman opined, based on the medical evidence, that Plaintiff could not do fine motor control of the left arm or carry more than five pounds, but he could work if he could find a job with no use of his left upper extremity. In fact, Dr. Freeman stated he thought use of the left arm would help that arm become more functional. The remainder of Dr. Freeman's statement speculates that Plaintiff would be unable to find such a job because employers would likely not hire him for a variety of safety, liability, and insurance coverage reasons, but these additional statements are not part of Dr. Freeman's medical opinion and are beyond his area of specialty, regardless of the use of the term "medically reasonable" in this part of his statement (Tr. 380). Dr. Freeman further stated he would support Plaintiff's attempts to seek employment (Tr. 380).

Although a reading of the ALJ's decision may make it appear as though he gave significant weight to Dr. Freeman's February 2011 statement only to the extent it said Plaintiff was employable, it is clear from the ALJ's resulting RFC that he gave the entire part of Dr. Freeman's statement that qualifies as a medical opinion significant weight, and the entirety of the statement indicates that if Plaintiff could find jobs that do not require him to use his left arm, he is capable of employment. There is no contradiction between this statement and other evidence, as all of the medical evidence in the record, including Dr. Freeman's statement, the opinion of the state agency physician, and Plaintiff's testimony pointed to the conclusion that Plaintiff was unable to use his left upper extremity in any significant way. At the hearing, which took place one year following the accident, the ALJ heard testimony from Plaintiff concerning the ways in which he could or could not use his arm, and relied on this testimony to conclude that Plaintiff could use the arm only as a guide. In posing his hypothetical question, the ALJ further clarified for the VE that the restriction was such that the left upper extremity "[was] not completely useless, but close to it" (Tr. 48). Therefore, Dr. Freeman's statement that Plaintiff was

employable if he could find a job where he did not use his left upper extremity is not at odds with the ALJ's RFC, and Plaintiff's characterization of Dr. Freeman's statement as precluding all employment is belied by the VE's testimony that an individual with this restriction could perform significant numbers of light jobs. The ALJ explicitly gave significant weight to at least part of Dr. Freeman's statement and impliedly gave weight to the entire statement by incorporating the restriction inherent in this statement in Plaintiff's RFC.

Even if the ALJ had not properly complied with the treating physician rule and had not given Dr. Freeman's statement controlling weight, the United States Court of Appeals for the Sixth Circuit has noted that a violation of the "good reasons" rule would be harmless error under three circumstances: where the treating source opinion was patently deficient such that it could not be credited; where the Commissioner adopted the opinion of the treating source or made findings consistent with that opinion; or where the Commissioner otherwise met the goal of the treating source regulation, 20 C.F.R. § 404.1527(c)(2). *Cole v. Astrue*, 661 F.3d 931, 940 (6th Cir. 2011) (quoting *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010)). As noted above, the ALJ clearly adopted the statement of Dr. Freeman and made findings consistent with that opinion because he incorporated the opinion in his RFC and did not reach an opposite conclusion. The only way in which the ALJ's RFC diverged from Dr. Freeman's statement was the indication that Plaintiff could use his left arm as a guide; however, given that most of the medical records span the first several months following the accident, when Plaintiff's arm was not fully healed, Plaintiff's testimony one year after the accident, in conjunction with the most recent treatment note from Dr. Freeman (which was five months after the next most recent note), was particularly relevant to his capabilities. In addition, this modification of the restriction was not at odds with Dr. Freeman's statement, as the ALJ clarified Plaintiff's left arm was close to

useless in his hypothetical question. Accordingly, I **CONCLUDE** the ALJ complied with the treating physician rule and gave appropriate weight and consideration to Dr. Freeman's statement and I further **CONCLUDE** that even if there was error in his treatment of Dr. Freeman's statement, any such error was harmless. And, after reviewing all of Plaintiff's arguments, I **CONCLUDE** the decision of the ALJ was supported by substantial evidence.

## V. CONCLUSION

Having carefully reviewed the administrative record and the parties' arguments, I **RECOMMEND** that:[1]

    (1)    Plaintiff's motion for summary judgment [Doc. 6] be **DENIED**.

    (2)    The Commissioner's motion for summary judgment [Doc. 8] be **GRANTED**.

    (3)    The Commissioner's decision denying benefits be **AFFIRMED**.

s/ *Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).